THIS OPINION IS A
PRECEDENT OF THE TTAB

Mailed: June 28, 2023

UNITED STATES PATENT AND TRADEMARK OFFICE
_____

Trademark Trial and Appeal Board
_____

*Advance Magazine Publishers, Inc.*
*v.*
*Fashion Electronics, Inc.*
_____

Opposition No. 91247034
_____

Jordan LaVine and Eric R. Clendening of Flaster Greenberg PC
    for Advance Magazine Publishers, Inc.

Christopher D. Lee of LA Commercial Attorney PC
    for Fashion Electronics, Inc.

_____

Before Kuhlke, Bergsman and Larkin,
    Administrative Trademark Judges.

Opinion by Kuhlke, Administrative Trademark Judge:

Applicant, Fashion Electronics, Inc., seeks registration on the Principal Register

of the standard character mark EVOGUE for a wide variety of consumer electronic

devices and accessories in International Class 9.[1]

---

[1] Application Serial No. 88143621 was filed on October 4, 2018, based on allegations of first use of the mark anywhere and first use of the mark in commerce at least as early as January 15, 2006 under Section 1(a) of the Trademark Act, 15 U.S.C. § 1051(a). The goods are set out in more detail later in this decision.

Opposer, Advance Magazine Publishers, Inc., opposes registration of Applicant's mark on two grounds. First, that Applicant's mark so resembles Opposer's previously used and registered VOGUE mark (used for a variety of goods and services including magazines and online media content in the fields of lifestyle and fashion, and software in the field of lifestyle and fashion for use with digital electronic devices) that when used in connection with Applicant's goods, is likely to cause confusion under Section 2(d) of the Trademark Act, 15 U.S.C. § 1052(d). Second, that Opposer's mark is famous, and Applicant's mark is likely to dilute its distinctiveness by blurring under Section 43(c) of the Trademark Act, 15 U.S.C. § 1125(c).[2]

By its Answer, Applicant admits Opposer's ownership of the pleaded applications and registrations[3] and otherwise denies the salient allegations of the Notice of Opposition. Applicant also asserts a bare, unspecified allegation of the affirmative defense of laches that we deem to have been tried by implied consent, given the evidence submitted during trial without objection and Opposer's response in its reply brief to Applicant's argument on the defense of laches. Fed. R. Civ. P. 15(b)(2); *Nextel Comm'ns, Inc. v. Motorola, Inc.*, 91 USPQ2d 1393, 1399 (TTAB 2009) (opposer did not

---

[2] Not. of Opp., 1 TTABVUE. The pleading of dilution is deficient in that it does not clearly set forth an allegation that Opposer's mark was famous prior to Applicant's use, but we consider the issue to have been tried by implied consent in view of the trial record and arguments in the briefs. *UMG Recordings Inc. v. Mattel Inc.*, 100 USPQ2d 1868, 1872 n.3 (TTAB 2011) (although opposer did not properly plead its fame for purposes of dilution, the Board deemed the dilution claim amended by implied consent). In addition, although Opposer also pleaded applications and registrations for two VOGUE-formative marks (TEEN VOGUE (now abandoned) and VOGUE RUNWAY), the allegations in the body of the pleading reference a single VOGUE mark. For simplicity, we reference the VOGUE mark by itself but consider all the various goods and services with which it is used. Our findings regarding the strength of the mark refer only to the VOGUE mark by itself.

[3] Two applications and one registration are now abandoned and cancelled.

plead issue preclusion as a ground for opposition, but applicant did not object to opposer's assertion of that ground in Opposer's brief and, in fact, addressed the issue in its own brief, so the Board deemed the pleadings amended under Fed. R. Civ. P. 15(b)).[4]

## I.  RECORD

The record includes the pleadings and, by operation of Trademark Rule 2.122(b)(1), 37 C.F.R. § 2.122(b)(1), the file of the application subject to the notice of opposition. In addition, the record includes:

- Opposer's Notices of Reliance on: photocopies of Office records for a pleaded application and photocopies of pleaded registrations prepared and issued by the Office showing both the current status of and current title to the registrations and application;[5] Applicant's Responses to certain Interrogatories and Requests for Admissions;[6] printouts of articles from the

---

[4] 5 TTABVUE. Applicant also pleaded other "affirmative defenses." The first "affirmative defense" that Opposer has failed to state a claim upon which relief can be granted is not a true affirmative defense because it relates to an assertion of the insufficiency of the pleading of Opposer's claims rather than a statement of a defense to a properly pleaded claim. *TiVo Brands LLC v. Tivoli, LLC*, 129 USPQ2d 1097, 1101 n.6 (TTAB 2018). Because Applicant did not pursue the purported insufficiency in Opposer's pleading by way of motion, or argue it in its brief, Applicant has waived it. *Alcatraz Media, Inc. v. Chesapeake Marine Tours Inc.*, 107 USPQ2d 1750, 1753 n.6 (TTAB 2013), *aff'd mem.*, 565 F. App'x 900 (Fed. Cir. 2014). Applicant's bare allegations of acquiescence, waiver or estoppel, and unclean hands in paragraphs 4 and 6 of its Answer do not adequately plead these affirmative defenses; moreover, they were not pursued at trial or in the brief and are considered waived. *Id.* The "affirmative defenses" in paragraphs 2, 3, 5 and 7 are not true affirmative defenses but rather amplifications of Applicant's denials. Applicant's attempt to "reserve all affirmative defenses" in paragraph 8 is improper. *Made in Nature, LLC v. Pharmavite LLC,* 2022 USPQ2d 557, at *6 (TTAB 2022).

[5] 25 TTABVUE.

[6] 26, 27 TTABVUE.

LexisNexis database from a variety of online magazines and newspapers referencing Opposer's VOGUE trademark;[7] Printouts of Trademark Trial and Appeal Board (TTAB) proceedings and decisions where Opposer successfully opposed an application or cancelled a registration containing the word VOGUE;[8]

- Opposer's testimony declarations of Anna-Lisa Yabsley, Opposer's Global Digital Strategy Lead and U.S. Executive Director of Content Strategy at Vogue, with exhibits (Yabsley Decl.),[9] and Rickie De Sole, Executive Fashion Director of Vogue.com, with exhibits (De Sole Decl.);[10]

- Applicant's Notices of Reliance on: Applicant's prior cancelled Registration No. 3368931 for the mark EVOGUE;[11] Opposer's Responses to certain Interrogatories;[12] printouts of Opposer's abandoned applications and cancelled prior registration;[13] printouts of online articles from various websites;[14] and

---

[7] 28-32 TTABVUE.

[8] 33 TTABVUE.

[9] 34 TTABVUE (public); 36 TTABVUE (confidential).

[10] 35 TTABVUE.

[11] 43 TTABVUE. Applicant also submitted a copy of its application subject to this proceeding, which was unnecessary in view of Trademark Rule 2.122(b)(1).

[12] 44 TTABVUE.

[13] 45 TTABVUE.

[14] 46 TTABVUE.

- Applicant's testimony declaration of Qiong Xiong, Applicant's President and Owner, with exhibits (Xiong Decl.).[15]

## II. ENTITLEMENT TO A STATUTORY CAUSE OF ACTION

Entitlement to a statutory cause of action must be proven by the plaintiff in every inter partes case. *See Australian Therapeutic Supplies Pty. Ltd. v. Naked TM, LLC*, 965 F.3d 1370, 2020 USPQ2d 10837, at *3 (Fed. Cir. 2020) (citing *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 109 USPQ2d 2061, 2067 n.4 (2014)), *cert. denied*, 142 S. Ct. 82 (2021). A plaintiff may oppose registration of a mark where such opposition is within the zone of interests protected by the statute, 15 U.S.C. § 1063, and the plaintiff has a reasonable belief in damage that would be proximately caused by registration of the mark. *Corcamore, LLC v. SFM, LLC*, 978 F.3d 1298, 2020 USPQ2d 11277, at *6-7 (Fed. Cir. 2020), *cert. denied*, 141 S. Ct. 2671 (2021).

As listed above, the record includes status and title copies of Opposer's pleaded registrations. In view thereof, Opposer's entitlement to a statutory cause of action to oppose registration of Applicant's mark is established. *Cunningham v. Laser Golf Corp.*, 222 F.3d 943, 55 USPQ2d 1842, 1844 (Fed. Cir. 2000) (pleaded registrations "suffice to establish … direct commercial interest"; a belief in likely damage can be shown by establishing a direct commercial interest); *Made in Nature*, 2022 USPQ2d 557, at *7 (pleaded registrations demonstrated entitlement to bring a statutory cause of action); *New Era Cap Co., Inc. v. Pro Era, LLC*, 2020 USPQ2d 10596, at *6 (TTAB 2020) (same).

---

[15] 48 TTABVUE (public); 47 TTABVUE (confidential).

## III. BACKGROUND

Opposer first used the mark VOGUE in connection with a weekly newspaper in 1892. Since then, it has continuously published an American monthly fashion and lifestyle magazine, and has expanded to various international editions. Yabsley Decl. ¶¶ 5, 8, 34 TTABVUE 3, 4. In connection with its media presence through its print and online magazine, and various social media platforms, including YouTube, Opposer provides advertising of merchandise for manufacturers and retailers of clothing and accessories, including technology accessories. *Id.* at ¶ 5, 34 TTABVUE 3. As part of that service, Opposer has also supplied merchants with cards and tags bearing the phrases "As Seen in Vogue" and "Vogue Says." *Id.* ¶ 6, 34 TTABVUE 3. Opposer owns over sixty active and valid U.S. registrations for marks containing the word VOGUE, dating back to 1908. *Id.* ¶ 9, 34 TTABVUE 4. Its website Vogue.com features information about VOGUE and the goods and services sold under its VOGUE mark, as well as information about VOGUE-branded editorial content through articles, podcasts, videos, and social media. *Id.* ¶ 22, 34 TTABVUE 6. Opposer also has published various VOGUE-branded electronic newsletters covering fashion, celebrity style, product and style recommendations, runway shows, royal families, weddings and fashion related news. *Id.* ¶ 21, 34 TTABVUE 6-7. These electronic newsletters include approximately 700,000 unique subscribers. *Id.* Vogue has "over 10 million [followers] on Facebook, over 40 million [followers] on Instagram, over 15 million [followers] on Twitter. Vogue is the number one fashion publisher on Instagram with respect to followers and engagement." *Id.* ¶ 25, 34 TTABVUE 7. Since at least 2013 Opposer features technology products and accessories in its magazine

6

and digital content, including, for example, Google Glass and Apple Watch. *Id*. ¶¶ 12-13, 34 TTABVUE 5; De Sole Decl. ¶ 8, Exhs. B and C, 35 TTABVUE 3-4, 10-68; Notice of Reliance, 32 TTABVUE 6-11, 13-17. Opposer offers a variety of VOGUE-branded products at its online store, including apparel, playing cards, jigsaw puzzles, mugs, iPhone cases, and wrapping paper. De Sole Decl. ¶ 5, 35 TTABVUE 3. Opposer asserts it has sold VOGUE-branded iPhone cases since at least as early as 2017. *Id*. An example from the Condé Nast online shop is shown below:[16]

Applicant is a "wholesaler phone accessories" business targeting "secondary wholesale distributors and retail stores in the market of consumer electronics and

---

[16] De Sole Decl. Exh. A, 35 TTABVUE 7 (https://condenaststore.com/collections/vogue+covers, retrieved August 16, 2021).

accessories." Xiong Decl. ¶12, 48 TTABVUE 4. Applicant's customers are mostly small-sized and family-owned companies. *Id.* Applicant has been using its EVOGUE mark since January 2006 in connection with, among other things, cell phone accessories, including cell phone covers, cell phone Bluetooth accessories, power banks and battery chargers. *Id.* ¶ 8, 48 TTABVUE 3.

Applicant owned a prior registration for the standard-character mark EVOGUE that issued on January 15, 2008, on the basis of claimed first use in January 2006. That registration was cancelled on August 17, 2018, for failure to file a renewal "caused by [Applicant's] miscommunication with [its] counsel." *Id.* ¶ 25, 48 TTABVUE 6. Applicant filed the subject application soon after on October 4, 2018. *Id.* ¶ 26, 48 TTABVUE 6.

Applicant's President testified that since its first use of the EVOGUE mark, Applicant has expended a "substantial" amount of money advertising and promoting its mark and has ongoing "substantial" sales of goods under its mark. *Id.* ¶¶ 14, 21, 48 TTABVUE 4-6 (actual numbers filed under seal). Applicant promotes its brand in the Wireless Dealer Magazine and General Merchandise Magazine and at consumer/electronic trade shows across the United States, including the International Consumer Electronics Show held in Las Vegas. *Id.* ¶¶ 15-19, 48 TTABVUE 5.

## IV.   LACHES

Applicant asserts the equitable defense of laches based on its now-expired prior registration. Section 19 of the Trademark Act provides that the equitable principle of laches "where applicable may be considered and applied." 15 U.S.C. § 1069. The

laches defense is available as a defense for both the likelihood of confusion and dilution claims. *Ava Ruha Corp. v. Mother's Nutritional Ctr., Inc.*, 113 USPQ2d 1575 (TTAB 2015); *Hornby v. TJX Cos.*, 87 USPQ2d 1411, 1419 (TTAB 2008); *see also Nat'l Cable Tel. Ass'n, Inc. v. Am. Cinema Eds., Inc.*, 937 F.2d 1572, 19 USPQ2d 1424, 1431 (Fed. Cir. 1991).

In the context of an opposition or cancellation proceeding, the laches defense must be tied to a party's registration of a mark rather than to its use of the mark. *Nat'l Cable Television*, 19 USPQ2d at 1432 (laches runs from the time from which action could be taken against the trademark rights attaching upon registration). In view of this timing element, laches generally does not apply in opposition proceedings. However, a laches defense "may be based upon opposer's failure to object to an applicant's earlier registration of the same mark for substantially the same goods." *Aquion Partners L.P. v. Envirogard Prods. Ltd.*, 43 USPQ2d 1371, 1373 (TTAB 1997) (citing *Lincoln Logs Ltd. v. Lincoln Pre-cut Log Homes, Inc.*, 971 F.2d 732, 23 USPQ2d 1701, 1703 (Fed. Cir. 1992) (citing *Copperweld Corp. v. Astralloy-Vulcan Corp.*, 196 USPQ 585, 591 (TTAB 1971))). An "opposer's failure to object to applicant's prior registration during the existence thereof [is] not wiped out by the expiration of the registration, albeit the period of delay end[s] with the expiration of that registration..." *Aquion Partners*, 43 USPQ2d at 1373 n.8; *see also Fishking Processors, Inc. v. Fisher King Seafoods Ltd.*, 83 USPQ2d 1762 (TTAB 2007). Where the defense is asserted based on an expired prior registration, the period of delay begins on the

issue date of the prior registration and ends with the cancellation of the prior registration. *Land O' Lakes, Inc. v. Hugunin*, 88 USPQ2d 1957, 1959 (TTAB 2008).[17]

To prove laches, in addition to showing unreasonable delay, an applicant must show it has suffered material prejudice as a result of the delay. *Aquion Partners*, 43 USPQ2d at 1373. The defense "usually requires factual development beyond the content of the pleadings. The facts evidencing unreasonableness of the delay and material prejudice to the defendant cannot be decided against the plaintiff based solely on presumptions." *Id.*

**Prior Registration**

Applicant's prior Registration No. 3368931 was for the identical mark EVOGUE in standard characters for the goods set forth below:[18]

> Cases for mobile phones; Cell phone covers; Devices for hands-free use of mobile phones; Hands free kits for phones; Battery cases; Cases for telephones; Protective carrying cases specially adapted for personal digital assistants (PDA); Specialty holster for carrying mobile phones, MP3 players, MP4 players, portable and handheld digital electronic devices for recording, organizing, transmitting, manupulating [sic] and reviewing audio files, personal digital assistants, portable musical devices, cameras, and portable video games.

---

[17] Opposer is incorrect in its argument that the expired registration may not serve as a basis for the laches defense. The language it quotes from *Land O'Lakes*, 88 USPQ2d at 1959, comes from the section discussing the prior registration ("*Morehouse*") defense. *See Morehouse Mfg. Corp. v. J. Strickland & Co.*, 407 F.2d 881, 160 USPQ 715 (CCPA 1969). Later in the *Land O'Lakes* decision, the Board makes clear that "[t]he defense [of laches] may be asserted even if the prior registration has expired … ." *Land O' Lakes*, 88 USPQ2d at 1959. Moreover, Opposer has not presented argument or evidence as to the laches elements concerning undue delay and prejudice.

[18] The original description of goods included products that were deleted in Applicant's Section 8, 15 U.S.C. § 1058, filing. We did not include them here inasmuch as they are not relevant to our analysis.

43 TTABVUE 7-59.

These goods are substantially the same as the following goods set forth in the current application:

> Battery cases; Cell phone cases; Cell phone covers; Earphones and headphones; Headsets for cellular or mobile phones; Headsets for use with computers; Carrying cases, holders, protective cases and stands featuring power supply connectors, adaptors, speakers and battery charging devices, specially adapted for use with handheld digital electronic devices, namely, mobile phones, portable musical devices, handheld digital music players; Clear protective covers specially adapted for personal electronic devices, namely, mobile phones, portable musical devices, handheld digital music players; Head-clip cell phone holders; Leather protective covers specially adapted for personal electronic devices, namely, mobile phones, portable musical devices, handheld digital music players; Pouches made in whole or substantial part of leather, faux leather, plastic, vinyle [sic] specially adapted for personal electronic devices, namely, mobile phones, portable musical devices, handheld digital music players, excluding gaming apparatus; Protective covers and cases for cell phones, laptops and portable media players; Wireless headsets for smartphones.

The identification in Applicant's prior registration is broadly written to the extent that all of the types of cases and covers in the current application are encompassed by or substantially the same as the various cases and covers listed in the prior registration. We consider the "ear phones and headphones; headsets for cellular or mobile phones; headsets for use with computers," and "head-clip cell phone holder" to be encompassed by the identifications "Devices for hands-free use of mobile phones; Hands free kits for phones." Because the prior registration was for the same mark and some of the goods are substantially the same, laches is an available defense as to those goods. However, the goods identified in the current application as "Battery

11

chargers; Battery chargers for mobile phones; Battery chargers for tablet computers; Cell phone battery chargers; Stands adapted for stereos and audio speakers; wireless speakers" are not substantially the same as those identified in the cancelled registration, and therefore the laches defense does not apply to these goods.

Applying the laches defense where not all of the goods in the current application are substantially the same as those listed in the prior registration departs somewhat from other scenarios where a prior registration may be relevant. For example, in the case of the *Morehouse* defense, where the goods or services in the application include others that are not present in the prior registration, the defense has been held to be unavailable as to any goods or services. *Bausch & Lomb Inc. v. Leupold & Stevens Inc.*, 1 USPQ2d 1497 (TTAB 1986) (*Morehouse* defense inapplicable where prior registration for "rifle scopes" and application for "telescopic sights, rifle scopes, handgun scopes, binoculars and spotting scopes"); *La Fara Importing Co. v. F. Lli de Cecco di Filippo Fara S. Martino S.p.a.*, 8 USPQ2d 1143, 1147 (TTAB 1988) (where prior registration is for alimentary pastes and the application includes other goods such as coffee, sugar, rice, cakes and sauces, the goods are neither "identical, substantially the same, or so related as to represent in law a distinction without a difference.") (quoting *Joseph & Feiss Co. v. Sportempos, Inc.*, 451 F.2d 1402, 172 USPQ 235 (CCPA 1971) (prior registration for ladies' suits, jackets and skirts prevents attack on application for the same mark for suits, jackets, and skirts; trousers and slacks; outer shorts, coats, outer dresses and sport shirts, blouses, shells, with and without sleeves; sweaters, shifts; and caps, all for women, young women and

girls)). The reasoning behind the *Morehouse* defense is that the plaintiff cannot be further damaged by another registration for substantially the same mark and substantially the same goods; in addition, for the *Morehouse* defense to apply, the prior registration must still exist. Where the application includes other goods (even related) along with the substantially similar goods, it is considered to be capable of causing further damage to a plaintiff.

By contrast, laches asks whether the plaintiff delayed in a manner that prejudices the defendant. In other words, as to the goods in the cancelled registration, the defendant should be protected by the laches defense, but as to the other goods laches provides no defense. In the circumstances presented by this case, where some but not all of the goods in a class are substantially similar, we find it appropriate to apply the laches defense to the goods identified in Applicant's cancelled registration or encompassed within those identified goods, and only consider Opposer's claims as to the remaining goods. To do otherwise would result in prejudice to Applicant if the goods for which laches could apply are the goods most closely related to Opposer's goods in the context of likelihood of confusion. We add that for the goods subject to the laches defense, we still must assess likelihood of confusion, but under the higher standard that focuses on whether confusion would be inevitable for the goods subject to the laches defense.

**Undue Delay**

Applicant argues that "the Board should consider applying the publication date for [Applicant's] prior registration instead of the publication date for the present

application ...." We reject that argument, which seeks to extend the period of delay behind the date on which the prior registration issued on January 15, 2008. There is no evidence of record to establish Opposer knew of Applicant's use prior to the publication date of the underlying application that matured into the prior registration. *See Brooklyn Brewery Corp. v. Brooklyn Brew Shop, LLC*, 2020 USPQ2d 10914, at *9 (TTAB 2020), *affirmed in relevant part, vacated in part, remanded*, 17 F.4th 129, 2021 USPQ2d 1069, at *3 (Fed. Cir. 2021). Therefore, the applicable period of delay, on which Applicant may rely, is from January 15, 2008 to August 17, 2018. This is more than a 10-year period of delay, during which time Applicant continuously used its registered mark, but "never received any cease-and-desist, objection, or any letter threatening litigation pertaining to [Applicant's] use and ownership of the 'EVOGUE' mark, whether from Opposer or otherwise." App. Brief, 52 TTABVUE 16; Xiong Decl. ¶¶ 23- 24, 48 TTABVUE 6.

It is unrebutted and we find as fact that Opposer never contacted Applicant to claim that there was a likelihood of confusion or dilution during the life of its prior Registration No. 3368931, which, as discussed above, was for the same mark and many substantially the same goods as the subject application.

"[I]n determining whether a party has too long 'slept on its rights' it is necessary to show that the party knew or should have known that it had a right of action, yet did not act to assert or protect its rights." *Bridgestone/Firestone Rsch. Inc. v. Auto. Club de l'Ouest de la France*, 245 F.3d 1359, 58 USPQ2d 1460, 1463 (Fed. Cir. 2001). Delays of as little as three and a half years have supported a finding of laches when

14

coupled with sufficient prejudice to a registrant. *See Teledyne Techs., Inc. v. W. Skyways, Inc.*, 78 USPQ2d 1203, 1211 (TTAB 2006) (finding that a delay of three years, eight months supported a laches defense to a cancellation based on Section 2(d) likelihood of confusion), *aff'd*, 208 F. App'x 886 (Fed. Cir. 2006); *Ava Ruha*, 113 USPQ2d at 1581 (finding a laches defense to cancellation supported by a delay of three years and two months); *TPI Holdings, Inc. v. TrailerTrader.com, LLC*, 126 USPQ2d 1409, 1414 (TTAB 2018) (four years and two months "within the realm of time found to be sufficient for purposes of laches.").

Based on the record, Opposer is charged with delay for the decade that Applicant's prior registration was on the Register, during which time Opposer never challenged or sought to cancel the prior registration. We find Opposer's delay of ten years and seven months (including the grace period and 30 days prior to cancellation) between the issuance date of Applicant's registration of the EVOGUE standard character mark and its cancellation to be unreasonable and to support a defense of laches.

**Prejudice**

"Two general categories of prejudice may flow from an unreasonable delay: prejudice at trial due to loss of evidence or memory of witnesses, and economic prejudice based on loss of time or money or foregone opportunity." *Bridgestone/Firestone*, 58 USPQ2d at 1463. "[W]hen there has been an unreasonable period of delay by a plaintiff, economic prejudice to the defendant may ensue whether or not the plaintiff overtly lulled the defendant into believing that the plaintiff would not act, or whether or not the defendant believed that the plaintiff would have

grounds for action." *Id*. "The question is whether there has been a change in the economic position [of the applicant] . . . during the period of delay." *Ava Ruha*, 113 USPQ2d at 1583 (citation omitted).

Economic prejudice may arise from investment in and development of a trademark, as well as the continued commercial use and economic promotion of a mark over a prolonged period. *Bridgestone/Firestone*, 58 USPQ2d at 1463. Applicant argues that the length of Opposer's delay dictates a finding that Applicant will suffer economic prejudice if it cannot re-register its mark because it "has expended millions of dollars and substantial efforts in advertising and promoting its Mark since 2006 to the present" and if Applicant loses "its Mark for phone accessories, [Applicant] will certainly sustain severe economic prejudice which constitutes a detriment to [Applicant] due to Opposer's delay." App. Brief, 52 TTABVUE 31. Applicant submitted its advertising expenditures and sales during the period of delay and beyond under seal; however, we may characterize the evidence as showing a steady and substantial increase each year for a number of years and then fluctuations with some decline, including during the beginning of the Covid-19 pandemic.

Applicant continued to invest in and develop its trademark and continued commercial use and economic promotion of its mark over a prolonged period when the mark was on the Principal Register. Loss of Applicant's rights in EVOGUE resulting from its inability to re-register the mark for its various cell phone accessories would result in economic prejudice and would be a detriment to Applicant due to the delay. *Ralston Purina Co. v. Midwest Cordage Co.*, 373 F.2d 1015, 153

16

USPQ 73, 76 (CCPA 1967) (long delay may provide basis for laches even without expansion of trade "… each day sees some incremental aggrandizement of good will— each advertising dollar expended adds in some sense to registrant's equity.").

The record evidence establishes that: (1) Applicant's mark in the prior registration and the current application are identical and most of the goods are substantially the same; (2) Opposer's delay of more than 10 years was unreasonable; and (3) Applicant will suffer economic prejudice. We hold that Applicant has proven laches as to the mark EVOGUE and the goods listed in the application that are substantially the same as those identified in its cancelled registration. *Brooklyn Brewery Corp. v. Brooklyn Brew Shop*, 17 F.4th 129, 2021 USPQ2d 1069, at *8 (Fed. Cir. 2021) (quoting *Aquion Partners*, 43 USPQ2d at 1373 ("[A] laches defense in an opposition proceeding may be based upon [an] opposer's failure to object to an applicant's earlier registration of substantially the same mark for substantially the same goods.").

## V.    SECTION 2(d) CLAIM

We turn now to Opposer's claim of likelihood of confusion. For Applicant's "Battery chargers; Battery chargers for mobile phones; Battery chargers for tablet computers; Cell phone battery chargers; Stands adapted for stereos and audio speakers; Wireless speakers," we consider whether there is likely confusion. For Applicant's goods that are substantially the same as those in the prior registration, in view of the laches determination, we must consider whether there is inevitable confusion. *Brooklyn Brewery*, 2021 USPQ2d 1069, at *8.

If confusion is inevitable, any private injury to the defendant is outweighed by the public's interest in preventing confusion. *Id.; Swank Inc. v. Ravel Perfume Corp.*,

438 F.2d 622, 168 USPQ 723 (CCPA 1971) (equitable defenses are not applicable where the marks are closely similar, since protection of the public from confusion "is the dominant consideration"); *see also SunAmerica Corp. v. Sun Life Assurance Co. of Can.*, 77 F.3d 1325, 38 USPQ2d 1065 (11th Cir. 1996). A showing of inevitable confusion is subject to a stringent standard that is satisfied only where both the goods and marks are nearly identical. *See Metro Traffic Control, Inc. v. Shadow Network Inc.*, 104 F.3d 336, 41 USPQ2d 1369, 1372 (Fed. Cir. 1997) ("[C]onfusion was 'so likely that it [wa]s virtually inevitable, because the parties [we]re using the identical mark [SHADOW TRAFFIC] for the identical services [traffic reporting].'"); *Ultra-White Co. v. Johnson*, 465 F.2d 891, 175 USPQ 166, 167 (CCPA 1972) (finding confusion inevitable for "identical term 'BRIGHTWHITE' or 'BRIGHT WHITE' for the specified goods"); *cf. In re Nat'l Distillers & Chem. Corp.*, 297 F.2d 941, 132 USPQ 271 (CCPA 1962) (finding differences between MARQUES DEL MERITO and MERITO for the non-identical goods wine and rum were "sufficient to raise a doubt as to the likelihood of confusion, mistake or deception of purchasers arising from the common use of the word MERITO").

The marks VOGUE and EVOGUE, on their face, are not identical, but even if considered nearly identical, the parties' respective goods and services, including Opposer's for which priority is not in issue, are neither identical nor nearly so. "[O]nce the Board [makes] the determination that neither the marks nor the goods were nearly identical, it is not clear that any further analysis [is] required to reject an inevitable confusion claim." *Brooklyn Brewery*, 2021 USPQ2d 1069, at \*9.

Nonetheless, for completeness, we address the various relevant *DuPont* factors in the context of inevitable confusion for the goods of Applicant which are identical to or substantially similar to those in the prior registration, but address the factors without regard to the higher standard as to the goods not shielded by the laches defense.

Our determination under Section 2(d) is based on an analysis of all of the probative facts in evidence that are relevant to the factors set forth in *In re E. I. du Pont de Nemours and Co.*, 476 F.2d 1357, 177 USPQ 563, 567 (CCPA 1973) (*DuPont*). In considering whether confusion is likely or inevitable we consider all of the *DuPont* factors for which there is evidence and argument. *In re Guild Mortg. Co.*, 912 F.3d 1376, 129 USPQ2d 1160, 1162-63 (Fed. Cir. 2019). Varying weights may be assigned to each *DuPont* factor depending on the evidence presented. *In re Charger Ventures LLC,* __F.4th__, 2023 USPQ2d 451 at *4 (Fed. Cir. 2023) ("In any given case, different *DuPont* factors may play a dominant role and some factors may not be relevant to the analysis."); *Citigroup Inc v. Cap. City Bank Grp., Inc.*, 637 F.3d 1344, 98 USPQ2d 1253, 1261 (Fed. Cir. 2011); *In re Shell Oil Co.*, 992 F.2d 1204, 26 USPQ2d 1687-88 (Fed. Cir. 1993). For any goods or services not covered by registrations of record. Opposer would have to prove, by a preponderance of the evidence, that it has priority with respect to its VOGUE mark vis-à-vis Applicant's mark EVOGUE, and that Applicant's use of its mark in connection with the respective goods identified in its application causes likely or inevitable confusion. *See Cunningham*, 55 USPQ2d at 1848.

## A. Priority

We list Opposer's most relevant registrations below:

- Registration No. 1336659 for the mark VOGUE, in typed format,[19] for a magazine in International Class 16;

- Registration No. 4138408 for the mark VOGUE, in stylized form for Downloadable computer software applications for use in connection with smartphones, PDA devices, tablet computers and other portable and handheld digital electronic devices, namely, downloadable software for accessing, viewing, interacting with and downloading content and information from magazines and websites in the field of fashion, style and beauty in International Class 9;

- Registration No. 4964883 for the mark VOGUE in stylized form for Advertising; Promotional services, namely, promoting the goods and services of others via digital and mobile networks; E-commerce services, namely, facilitating e-commerce business transactions by processing electronic orders for purchases of goods and services via a global computer network in International Class 35;

- Registration No. 4964884 for the mark VOGUE in standard characters for Advertising; Promotional services, namely, promoting the goods and services of others via digital and mobile networks; E-commerce services, namely, facilitating e-commerce business transactions by processing electronic orders for purchases of goods and services via a global computer network in International Class 35.

Because these pleaded registrations are not the subject of counterclaims, priority is not in issue with respect to the marks, and goods and services, in these

---

[19] A typed mark is the legal equivalent of a standard character mark. *See In re Viterra Inc.*, 671 F.3d 1358, 101 USPQ2d 1905, 1909 n.2 (Fed. Cir. 2012) ("[U]ntil 2003, 'standard character' marks formerly were known as 'typed' marks… .").

registrations. *King Candy Co., Inc. v. Eunice King's Kitchen, Inc.*, 496 F.2d 1400, 182 USPQ 108 (CCPA 1974); *Rsch. in Motion Ltd. v. Defining Presence Mktg. Grp., Inc.*, 102 USPQ2d 1187, 1190 (TTAB 2012). Opposer only relies on the registrations for priority. In addition, Opposer has not proven priority with respect to use of its mark for phone covers or any of the goods listed in Applicant's application, including Applicant's battery chargers; battery chargers for mobile phones; battery chargers for tablet computers; cell phone battery chargers; stands adapted for stereos and audio speakers; wireless speakers, or other electronic goods such as laptop computers or their covers, as discussed more fully below. *See* De Sole Decl. ¶ 8, 35 TTABVUE 3, 11-78 (website excerpts retrieved in 2021).

### B. Strength/Weakness of the mark VOGUE

Opposer argues that its VOGUE mark is conceptually and commercially strong, rising to the level of being famous for purposes of likelihood of confusion. "In determining strength of a mark, we consider both inherent strength, based on the nature of the mark itself, and commercial strength or recognition." *Bell's Brewery, Inc. v. Innovation Brewing*, 125 USPQ2d 1340, 1345 (TTAB 2017) (citing *Couch/Braunsdorf Affinity, Inc. v. 12 Interactive, LLC*, 110 USPQ2d 1458, 1476 (TTAB 2014)); *see also In re Chippendales USA Inc.*, 622 F.3d 1346, 96 USPQ2d 1681, 1686 (Fed. Cir. 2010) ("A mark's strength is measured both by its conceptual strength (distinctiveness) and its marketplace strength …"); 2 J. Thomas McCarthy, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 11:80 (5th ed. March 2023 Update) ("McCarthy") ("The first enquiry is for conceptual strength and focuses on

the inherent potential of the term at the time of its first use. The second evaluates the actual customer recognition value of the mark at the time registration is sought or at the time the mark is asserted in litigation to prevent another's use.").

Conceptually, the word VOGUE itself, used in connection with a fashion magazine and goods and services connected with the magazine (e.g., downloadable software for downloading content and information from magazines and websites in the field of fashion, style and beauty; promoting the goods and services of others via digital and mobile networks; facilitating e-commerce business transactions) is somewhat suggestive of the subject matter. Opposer does not dispute that the word "'vogue' is synonymous with fashion." Opposer's Brief, 49 TTABVUE 18. We take judicial notice that "vogue" is defined as "something in fashion, as at a particular time."[20]

Despite some conceptual suggestiveness, the evidence of record points to extremely high commercial strength of the mark VOGUE for magazines and online content in the field of fashion and even more generally in the field of fashion (e.g., partnerships with celebrities, sponsorship of large fashion events). Opposer's witness testifies that VOGUE is considered "one of the most recognizable and well-known fashion brands in the United States" and a recognized leader in the field of fashion and style. Opposer's Brief, 49 TTABVUE 17; Yabsley Decl. ¶ 26, 34 TTABVUE 8. This sentiment is borne out by the record with unsolicited media references referring to Vogue Magazine as having a "star image" (Opp. Notice of Reliance, 29 TTABVUE 23

---

[20] Dictionary.com based on THE RANDOM HOUSE UNABRIDGED DICTIONARY (2023). The Board may take judicial notice of dictionary definitions. *In re Cordua Rests. LP*, 110 USPQ2d 1227, 1229 n.4 (TTAB 2014), *aff'd*, 823 F.3d 594, 118 USPQ2d 1632 (Fed. Cir. 2016).

(*The New York Times* August 6 2009); the "world's most influential fashion franchise" (*Id.* at 26) (*The New York Times* September 2008); and "the industry bible" Opp. Notice of Reliance, 30 TTABVUE 12 (*The Wall Street Journal*, September 16, 2003). Opposer's advertising and sales figures were submitted under seal and we do not reference specific numbers but they are quite high. In addition, the evidence shows broad and sustained consumer exposure to Opposer's VOGUE mark for over a hundred years. *Id.* at ¶ 5, 34 TTABVUE 3. Opposer's magazine monthly readership is approximately 8.3 million people, and Vogue's website receives 12 to 16 million unique visitors over a period of 6 months. *Id.* at ¶¶ 10, 23, 34 TTABVUE 4, 7. These visitors collectively spend between 27 to 39 million minutes on the website per month. Opposer's Vogue YouTube channel has approximately 9.95 million subscribers and its videos have accumulated over 180 million video views. *Id.* at ¶¶ 23, 24, 34 TTABVUE 7. Opposer has over 70 million followers on its social media pages: 10 million on Facebook; over 40 million on Instagram; and over 15 million on Twitter. *Id.* at ¶ 25, 34 TTABVUE 7. Opposer collaborates with high-profile celebrities (e.g., Madonna, Lady Gaga, Beyonce) and partners with high profile brands to offer VOGUE-branded products, editorial content, and events. *Id.* at ¶ 11, 34 TTABVUE 4. One of the larger events is the annual Met Gala that has garnered more buzz on Twitter than the Super Bowl, Academy Awards, Coachella and New York Fashion Week. *Id.* at ¶ 27, 34 TTABVUE 8. VOGUE magazine is referenced in many widely circulated publications such as THE NEW YORK TIMES, USA TODAY, THE WALL STREET JOURNAL and NEWSWEEK. Opp. Notice of Reliance, 30 TTABVUE.

23

Opposer aggressively enforces its VOGUE mark, including against goods in International Class 9. Opposer "submitted six instances where the Board ruled in favor of Opposer and sustained oppositions and cancellations with respect to marks containing the term 'VOGUE' in International Class 9" for the marks VOGUISH (cell phone cases), DÉCOR IN VOGUE (meat thermometer), VOGUE BOOTH (photo kiosks), WOVOGUE (covers for smart phones), VOUGERY (batteries battery chargers cell phone cases) and VOGUETECH (cell phone cases). Opposer's Brief, 49 TTABVUE 19; Opposer's Notice of Reliance, 33 TTABVUE 5-86. In each case, the proceeding ended in default for failure to answer and there was no disposition on the merits of Opposer's claims.[21] The success Opposer has enjoyed may reflect the inability or unwillingness on the part of the various defendants to expend funds defending a mark. By definition, these defaults are not probative of consumer exposure, but they do show an active policing program to assert a broad scope of protection.

In the likelihood of confusion analysis, "fame 'varies along a spectrum from very strong to very weak.'" *Joseph Phelps Vineyards, LLC v. Fairmont Holdings, LLC,* 857 F.3d 1323, 122 USPQ2d 1733, 1734 (Fed. Cir. 2017) (quoting *In re Coors Brewing Co.,* 343 F.3d 1340, 68 USPQ2d 1059, 1063 (Fed. Cir. 2003)). We find, for purposes of likelihood of confusion, that VOGUE is famous for print and online magazines in the fields of fashion and lifestyle and more generally in the fashion industry, entitling it

---

[21] In addition, Opposer successfully opposed a third-party application for the mark EVOGUE NEW YORK for goods in International Class 3, including perfume, cologne, and beauty care cosmetics. Opposer's Notice of Reliance, 33 TTABVUE 87-96 (applicant expressly abandoned its application).

to a broad scope of protection and this weighs in favor of a finding of a likelihood of confusion.

### C. Similarity of the Marks

Considering the similarity or dissimilarity of the parties' marks, we compare them in their entireties in terms of appearance, sound, connotation and commercial impression. *In re Detroit Athletic Co.*, 903 F.3d 1297, 128 USPQ2d 1047, 1048 (Fed. Cir. 2018); *see also Palm Bay Imps. Inc. v. Veuve Clicquot Ponsardin Maison Fondee En 1772*, 396 F.3d 1369, 73 USPQ2d 1689, 1694 (Fed. Cir. 2005). "Similarity in any one of these elements may be sufficient to find the marks confusingly similar." *In re Inn at St. John's, LLC*, 126 USPQ2d 1742, 1746 (TTAB 2018) (quoting *In re Davia*, 110 USPQ2d 1810, 1812 (TTAB 2014) (citing *In re White Swan Ltd.*, 8 USPQ2d 1534, 1535 (TTAB 1988)).

"The proper test is not a side-by-side comparison of the marks, but instead whether the marks are sufficiently similar in terms of their commercial impression such that persons who encounter the marks would be likely to assume a connection between the parties." *Coach Servs. Inc. v. Triumph Learning LLC*, 668 F.3d 1356, 101 USPQ2d 1713, 1721 (Fed. Cir. 2012) (quotation omitted).

Applicant's mark EVOGUE encompasses the entirety of Opposer's mark VOGUE, which increases the marks' similarity. *Stone Lion Cap. Partners, LP v. Lion Cap. LLP*, 746 F.3d 1317, 110 USPQ2d 1157, 1161 (Fed. Cir. 2014) (affirming Board's finding that applicant's mark STONE LION CAPITAL incorporated the entirety of the registered marks LION CAPITAL and LION, and that the noun LION was the

dominant part of both parties' marks); *Double Coin Holdings Ltd. v. Tru Dev.*, 2019 USPQ2d 377409, at *6-7 (TTAB 2019) (quoting *Hunter Indus., Inc. v. Toro Corp.*, 110 USPQ2d 1651, 1660 (TTAB 2014)).

For consumers that view the letter E in Applicant's mark as signifying "electronic,"[22] the VOGUE portion would have the same connotation and commercial impression in the respective marks. In that case, the addition of the letter E in Applicant's EVOGUE mark adds another layer of meaning, but could be perceived as a variation of Opposer's VOGUE mark denoting the online or electronic aspect of the goods and services. *See, e.g., Kangol Ltd. v. Kangaroos U.S.A., Inc.*, 974 F.2d 161, 23 USPQ2d 1945, 1946 (Fed. Cir. 1992) ("What is important is not whether people will necessarily confuse the marks, but whether the marks will be likely to confuse people into believing that the goods they are purchasing emanate from the same source."); *Schieffelin & Co. v. Molson Cos.*, 9 USPQ2d 2069, 2073 (TTAB 1989) ("Those consumers who do recognize the differences in the marks may believe that applicant's mark is a variation of opposer's mark that opposer has adopted for use on a different product."); *In re Toshiba Med. Sys. Corp.*, 91 USPQ2d 1266, 1271 (TTAB 2009) (VANTAGE TITAN "more likely to be considered another product from the previously anonymous source of TITAN medical diagnostic apparatus, namely, medical ultrasound devices").

---

[22] We take judicial notice that one definition of "electronic" is "of or noting computerized products, services, or technologies: online electronic dictionaries; electronic banking." Dictionary.com based on RANDOM HOUSE UNABRIDGED DICTIONARY (2023).

Overall, we find the marks to be similar for purposes of likely confusion but not so similar as to support a finding of inevitable confusion. Thus, for the "Battery chargers; Battery chargers for mobile phones; Battery chargers for tablet computers; Cell phone battery chargers; Stands adapted for stereos and audio speakers; wireless speakers" this factor weighs in favor of likely confusion, but does not weigh in favor of inevitable confusion for Applicant's other goods. Even if the parties' marks are considered nearly identical and this factor is weighed in favor of inevitable confusion, as discussed below, the differences in the goods precludes a finding of inevitable confusion. *Teledyne*, 78 USPQ2d at 1212 (finding confusion likely but not inevitable, where the parties' marks were identical but the goods, although commercially related, were "hardly identical").

**D. Relatedness of the Goods and Services, Channels of Trade, and Conditions of Sale**

We must make our determinations under these factors based on the goods and services as they are recited in the registrations and application. *See Octocom Sys. Inc. v. Hous. Comput. Servs., Inc.*, 918 F.2d 937, 16 USPQ2d 1783, 1787 (Fed. Cir. 1990) ("The authority is legion that the question of registrability of an applicant's mark must be decided on the basis of the identification of goods [or services] set forth in the application regardless of what the record may reveal as to the particular nature of an applicant's goods, the particular channels of trade or the class of purchasers to which sales of the goods are directed."); *Paula Payne Prods. Co. v. Johnson Publ'g Co.*, 473 F.2d 901, 177 USPQ 76, 77 (CCPA 1973) (Board must "give full sweep" to an identification of goods or services regardless of registrant's actual business).

Opposer's registered goods and services on their face are very different from Applicant's goods on their face. As noted above, Opposer also offers a variety of VOGUE-branded products at its online store, including apparel, playing cards, jigsaw puzzles, mugs, iPhone cases, and wrapping paper. De Sole Decl. ¶ 5, 35 TTABVUE 3. However, Opposer has not established priority with regard to these goods. In particular, Opposer asserts it has sold VOGUE-branded iPhone cases since at least as early as 2017. *Id.* Because Applicant has proven that it began use of its mark in connection with phone covers in 2006, Opposer has not established priority for phone covers.

With respect to Opposer's Class 9 goods for downloadable software, they are certainly not identical to Applicant's goods and there is no evidence to support a finding that consumers view such goods as nearly identical or related to phone accessories and the other electronic goods in the application. Opposer argues that technology accessories (such as protective cases for electronic devices) are featured in its media and consumers look to VOGUE for fashion advice and information. While this may be so, it is not probative of this factor because although shown in the magazine, Opposer displays these electronic goods in connection with third-party marks. Accordingly, we find that Applicant's goods are not related to the goods and services in Opposer's pleaded registrations.

As to channels of trade, we presume all normal channels for such goods and services in the absence of restrictions in the identifications. Applicant's types of goods are offered for sale or advertised on Opposer's website. Accordingly, we find that

Applicant's types of goods are offered in the same channels of trade as the goods and services in Opposer's pleaded registrations.

We also consider the factor of "[t]he conditions under which and buyers to whom sales are made, i.e., 'impulse' vs. careful, sophisticated purchasing," *DuPont*, 177 USPQ at 567, based on the identifications of goods in the pleaded registrations and subject application, as the identifications determine the scope of the benefit of registration. *Stone Lion*, 110 USPQ2d at 1162 (quoting *Octocom*, 16 USPQ2d at 1787). The identifications include all goods and services of the type identified, without limitation as to their nature or price. *Levi Strauss & Co. v. Abercrombie & Fitch Trading Co.*, 719 F.3d 1367, 107 USPQ2d 1167, 1173 (Fed. Cir. 2013). Thus, the goods are presumed to include products that are relatively inexpensive. "When products are relatively low-priced and subject to impulse buying, the risk of likelihood of confusion is increased because purchasers of such products are held to a lesser standard of purchasing care." *Recot Inc. v. M.C. Becton*, 214 F.3d 1322, 54 USPQ2d 1894, 1899 (Fed. Cir. 2000), *cited in In re FabFitFun, Inc.*, 127 USPQ2d 1670, 1673 (TTAB 2018). *See also Stone Lion*, 110 USPQ2d at 1163-64 (recognizing Board precedent requiring consideration of the "least sophisticated consumer in the class"). Because the buyers to whom sales are made are all general consumers, and the goods at issue include relatively low-priced products (e.g., magazines, phone covers), the goods are subject to a lower level of purchaser care.

Although the lower level of consumer care and overlap in the channels of trade weigh in favor of likely and inevitable confusion, the respective goods and services are sufficiently different to weigh against likely and inevitable confusion.

## E. Variety of Goods and Services on Which Opposer's Mark is Used

Opposer argues VOGUE is a "house mark for a variety of goods and services, including magazines, websites, videos, live events, software applications, merchandise, e-commerce, advertising and marketing services, and retail store services featuring VOGUE-branded merchandise." Opposer's Brief, 49 TTABVUE 30. Although the record shows that many of Opposer's uses of VOGUE occurred after Applicant's use, there is sufficient evidence to show Opposer's use of the VOGUE mark in connection with a variety of goods and services and this factor weighs in favor of finding of a likelihood of confusion.

## F. Actual Confusion

Applicant argues that the absence of any instances of actual confusion despite Applicant's use of its mark EVOGUE for over 16 years beginning in 2006, shows there is no likely confusion.

In *Guild Mortg.* the Board laid out the analysis for the factor dealing with the absence of evidence of actual confusion:

> As noted above, our analysis as to the second, third, and fourth *du Pont* factors, discussing the similarity or dissimilarity of the services, channels of trade, and relevant consumers, is based, as dictated by precedent from the Federal Circuit, on the identifications **as set forth** in the application and the cited registration. As such, we may not consider, in assessing these *du Pont* factors, evidence

> of how Applicant and Registrant are **actually rendering** their services in the marketplace.
>
> The eighth *du Pont* factor, by contrast … requires us to look at **actual market conditions**, to the extent there is evidence of such conditions of record. In this regard, we consider all of the evidence of record that may be relevant to the eighth *du Pont* factor.

*Guild Mortg.*, 2020 USPQ2d 10279, at \*6 (emphasis in original, citations omitted).

The record does not contain evidence of actual market overlap. Although we have found that the types of goods and services of the parties may be sold in the same trade channels, Applicant's President attests that the EVOGUE goods are actually sold in channels of trade different from Opposer's. Xiong Decl. ¶¶ 11, 12, 15, 16, 17, 18, 48 TTABVUE 4, 5. Thus, we find that Applicant cannot establish that there have been meaningful opportunities for confusion to occur.

The factors addressing the length of time of concurrent use and actual confusion or lack thereof are neutral.

### G. Balancing of the Factors

We have considered all of the evidence pertaining to the relevant *DuPont* factors, as well as the parties' arguments with respect thereto. In balancing the relevant factors, the difference in the goods and services, despite the fame of Opposer's mark VOGUE, outweigh the other factors. We find no likely or inevitable confusion. *Teledyne*, 78 USPQ2d at 1212.

## VI. DILUTION

To prevail on a claim of dilution by blurring, a plaintiff must show that: (1) it owns a famous mark that is distinctive; (2) Applicant is using a mark in commerce that

31

allegedly dilutes Opposer's famous mark; (3) Applicant's use of its mark began after Opposer's became famous; and (4) Applicant's use of its mark is likely to cause dilution by blurring or tarnishment. *N.Y. Yankees P'ship v. IET Prods. & Servs., Inc.*, 114 USPQ2d 1497, 1502 (TTAB 2015) (quoting *Coach Servs.*, 101 USPQ2d at 1723-24). To show Applicant's mark is likely to cause dilution by blurring we consider:

> (i) the degree of similarity between Applicant's mark and Opposer's famous mark;
>
> (ii) the degree of inherent or acquired distinctiveness of Opposer's mark;
>
> (iii) the extent to which Opposer is engaging in substantially exclusive use of its mark;
>
> (iv) the degree of recognition of Opposer's mark;
>
> (v) whether Applicant intended to create an association with Opposer's mark; and
>
> (vi) any actual association between Applicant's mark and Opposer's mark.

15 U.S.C. § 1125(c)(2)(B)(i-vi) .

In the context of a dilution claim, in considering the similarity of the marks it is sufficient if the defendant's mark "trigger[s] consumers to conjure up" plaintiff's mark. In other words, "'upon seeing the junior party's use of a mark on its goods, [consumers] are immediately reminded of the famous mark and associate the junior party's use with the owner of the famous mark, even if they do not believe that the goods come from the famous mark's owner.'" *Nike, Inc. v. Maher*, 100 USPQ2d 1018, 1030 (TTAB 2011) (quoting *Toro Co. v. Torohead Inc.*, 61 USPQ2d 1164, 1183 (TTAB 2001)).

In connection with Applicant's goods to which the laches defense applies, as discussed above, in the context of a likelihood of confusion claim, where confusion is inevitable (i.e., where the marks and goods or services are identical or nearly identical), any prejudice to a defendant caused by a plaintiff's delay is outweighed by the public's interest in being protected against inevitable confusion. *See* McCARTHY § 20.77. In contrast, dilution does not involve confusion of the public, but rather provides extraordinary protection to owners of "the select class of marks – those with such powerful consumer association that even non-competing uses can impinge on their value," *Toro,* 61 USPQ2d at 1179 (quoting *Avery Dennison Corp. v. Sumpton,* 189 F.3d 868, 51 USPQ2d 1801, 1805 (9th Cir. 1999)), and for that reason, we need not engage in any further analysis of Opposer's dilution claim. Once laches has been established, it is a complete defense to Opposer's dilution claim, because there is no public interest in preventing the registration of the EVOGUE mark that outweighs the prejudice to Applicant that would occur if it cannot re-register the EVOGUE mark after it has been using the mark continuously for more than 15 years, and owned a Principal Register registration for more than 10 years without challenge from Opposer. *See Ava Ruha,* 113 USPQ2d at 1583 (citing *TCPIP Holding Co. v. Haar Commc'ns. Inc.,* 244 F.3d 88, 57 USPQ2d 1969, 1975 (2d Cir. 2001) ("The Dilution Act offers no benefit to the consumer public—only to the owner."); *Pharmacia Corp. v. Alcon Labs., Inc.,* 201 F. Supp.2d 335, 381 n.17 (D.N.J. 2002) ("Dilution does not implicate any public interest against consumer deception because, by definition, it protects only a trademark owner's private interest."); *Hornby,* 87 USPQ2d at

1419 ("[T]he claim of dilution relates to a personal right of petitioner, rather than being in the interest of the general public.")). *See also* McCarthy § 24:130 ("Unlike cases of traditional trademark infringement, in dilution cases there is no strong policy of consumer confusion to weigh against dismissal or narrowing of relief due to the equities created by delay or acquiescence").

We now turn to consideration of Opposer's dilution claim against Applicant's goods to which the laches defense does not apply, namely, the battery chargers; battery chargers for mobile phones; battery chargers for tablet computers; cell phone battery chargers; stands adapted for stereos and audio speakers; wireless speakers.

## A. Opposer Owns a Distinctive, Famous Mark

As discussed above, Opposer's mark is inherently distinctive. It is registered on the Principal Register without a claim of acquired distinctiveness, and is therefore presumed distinctive. *Sock It to Me, Inc. v. Fan*, 2020 USPQ2d 10611, at \*10 (TTAB 2020). As for whether the mark is sufficiently "famous" to be entitled to protection against dilution, we must determine whether it "is widely recognized by the general consuming public of the United States as a designation of source of the goods or services of the mark's owner." *N.Y. Yankees P'ship*, 114 USPQ2d at 1502 (quoting 15 U.S.C. § 1125(c)(2)(A)). In doing so, we consider:

> (i) The duration, extent, and geographic reach of advertising and publicity of the mark, whether advertised or publicized by the owner or third parties;
>
> (ii) The amount, volume, and geographic extent of sales of goods or services offered under the mark;
>
> (iii) The extent of actual recognition of the mark; and

> (iv) Whether the mark was registered under the Act of March 3, 1881, or the Act of February 20, 1905, or on the principal register.

15 U.S.C. § 1125(c)(2)(A).

1. Advertising and Publicity

As discussed above, Opposer's mark has enjoyed extensive publicity for over 100 years, including advertising by Opposer itself, and its promotional partners.

2. Sales of Goods and Services Under the VOGUE Mark

Opposer's sales as measured by subscriptions through its various outlets are quite significant. The evidence is persuasive and corroborative of the advertising and publicity evidence.

3. Actual Recognition of the Mark

"Perhaps the most significant of the four elements set forth in the Act to determine fame is the extent of actual public recognition of the mark as a source-indicator for the goods or services in connection with which it is used." *TiVo Brands LLC v. Tivoli, LLC*, 129 USPQ2d at 1104 (quoting *Nike*, 100 USPQ2d at 1024). It would be difficult to overstate the extent of public recognition of the VOGUE mark. As discussed above in the context of likelihood of confusion, the evidence shows widespread recognition of the mark by a substantial fraction of the United States population and is famous. Dilution requires a higher showing of fame and the evidence shows VOGUE is so widely recognized in the United States to meet that level.

4. VOGUE is Registered on the Principal Register

Opposer's VOGUE mark has been registered on the Principal Register for 100 years. The registrations are not based on a claim of acquired distinctiveness and many are incontestable.

5. VOGUE is Famous

By any and all measures, the evidence establishes that VOGUE is a famous mark, and entitled to protection against dilution under 15 U.S.C. § 1125(c).

## B. Applicant is using EVOGUE, a Mark That Allegedly Dilutes Opposer's VOGUE Mark

Applicant is using its EVOGUE mark in commerce and seeks to register it in the United States. Because Opposer bases one of its grounds for opposition on its allegation that EVOGUE dilutes Opposer's VOGUE mark, this element is also satisfied. *See Chanel, Inc., v. Makarczyk*, 110 USPQ2d 2013, 2023 (TTAB 2014).

## C. Opposer's VOGUE Mark Was Famous Before Applicant's First Use of EVOGUE

There is no question that Opposer's VOGUE mark was famous well before Applicant's first use in 2006. *See, e.g.*, Notices of Reliance, 28, 29, 30 TTABVUE (articles from various publications dating back to 2000); Yabsley Decl. ¶ 20, 34 TTABVUE 6.

## D. Applicant's Use of Its EVOGUE Mark is Likely to Cause Dilution By Blurring

Dilution by blurring is "an association arising from the similarity between a mark or trade name and a famous mark that impairs the distinctiveness of the famous mark." *Coach Servs.*, 101 USPQ2d at 1724 (quoting 15 U.S.C. § 1125(c)(2)(B)). It

36

"occurs when a substantial percentage of consumers, on seeing the junior party's mark on its goods, are immediately reminded of the famous mark and associate the junior party's mark with the owner of the famous mark, even if they do not believe that the goods emanate from the famous mark's owner." *N.Y. Yankees P'ship*, 114 USPQ2d at 1509.

The concern is that "the gradual whittling away of distinctiveness will cause the trademark holder to suffer 'death by a thousand cuts.'" *Nat'l Pork Bd. v. Supreme Lobster & Seafood Co.*, 96 USPQ2d 1479, 1497 (TTAB 2010) (citation omitted). *See also, Enter. Rent-A-Car Co. v. Advantage Rent-A-Car Inc.*, 330 F.3d 1333, 66 USPQ2d 1811, 1816 (Fed. Cir. 2003) ("dilution law is intended to protect a mark's owner from dilution of the mark's value and uniqueness"). Blurring may occur "regardless of the presence or absence of actual or likely confusion, of competition, or of actual economic injury." *Omega SA (Omega AG) (Omega Ltd.) v. Alpha Phi Omega*, 118 USPQ2d 1289, 1298 (TTAB 2016) (quoting 15 U.S.C. § 1125(c)).

To determine whether Applicant's use of its mark is likely to cause dilution by blurring, we consider:

> (i) the degree of similarity between Applicant's mark and Opposer's famous mark;
>
> (ii) the degree of inherent or acquired distinctiveness of Opposer's mark;
>
> (iii) the extent to which Opposer is engaging in substantially exclusive use of its mark;
>
> (iv) the degree of recognition of Opposer's mark;
>
> (v) whether Applicant intended to create an association with Opposer's mark; and

37

(vi) any actual association between Applicant's mark and Opposer's mark.

15 U.S.C. § 1125(c)(2)(B)(i-vi).

1. The Marks are Similar

We "consider the degree of similarity or dissimilarity of the marks in their entireties as to appearance, [sound], connotation, and commercial impression." *N.Y. Yankees P'ship*, 114 USPQ2d at 1506 (citing *Rsch. in Motion Ltd.*, 102 USPQ2d at 1198. "In the dilution context, 'the similarity between the famous mark and the allegedly blurring mark need not be substantial in order for the dilution by blurring claim to succeed.'" *TiVo Brands*, 129 USPQ2d at 1115 (quoting *Nike*, 100 USPQ2d at 1029). We must determine whether Applicant's EVOGUE mark is sufficiently similar to Opposer's VOGUE mark as to "trigger consumers to conjure up" Opposer's mark. *Nike*, 100 USPQ2d at 1030 (quoting *Nat'l Pork Bd.*, 96 USPQ2d at 1497).

As discussed above, the marks are similar, with only the E at the beginning of Applicant's mark to distinguish them. Because Applicant's mark includes the entirety of Opposer's mark the marks look similar. *Rsch. in Motion*, 102 USPQ2d at 1198 ("we find that there is a high degree of similarity between applicant's mark [CRACKBERRY] and opposer's famous mark [BLACKBERRY]"). They also sound similar. *Cf. Russell Chem. Co. v. Wyandotte Chem. Corp.*, 337 F.2d 660, 143 USPQ 252 (CCPA 1964) (SENTOL similar in sound to SEN-TROL). Although the E in Applicant's mark makes a difference in meaning and commercial impression, indicating an electronic aspect, as discussed above, this could be understood as a variation on Opposer's VOGUE mark.

2. Opposer's Mark is Inherently Distinctive

Opposer's mark is presumed inherently distinctive based on the registrations issuing without reliance on acquired distinctiveness under Section 2(f). However, it does have some conceptual suggestiveness in the context of a fashion magazine.

3. Opposer's Use of VOGUE is Substantially Exclusive

There is no record evidence demonstrating use of VOGUE for goods or services similar or related to Opposer's goods and services.

4. Opposer's VOGUE Mark is Widely Recognized in the United States

As discussed above, the record shows the VOGUE mark is widely recognized in the United States.

5. The Record Does Not Show that Applicant Intended to Create an Association with Opposer's VOGUE Mark

There is no evidence of record on this factor.

6. Actual Association Between EVOGUE and VOGUE

There is no evidence of record on this factor.

**E. Use of Applicant's Mark Will Impair the Distinctiveness of Opposer's Famous and Distinctive VOGUE Mark**

There is no question that VOGUE is a famous mark, that VOGUE goods and services are widely used and recognized by a large percentage of the United States population, or that Opposer's VOGUE mark is distinctive. This was the case prior to Applicant's proven date of first use of its mark. Moreover, there is no evidence that any United States marks come as close to VOGUE as Applicant's EVOGUE mark.

39

This impairs the distinctiveness of Opposer's previously registered mark. In view thereof, we find dilution by blurring.

## VII. Conclusion

With regard to Applicant's

> Battery cases; Cell phone cases; Cell phone covers; Earphones and headphones; Headsets for cellular or mobile phones; Headsets for use with computers; Carrying cases, holders, protective cases and stands featuring power supply connectors, adaptors, speakers and battery charging devices, specially adapted for use with handheld digital electronic devices, namely, mobile phones, portable musical devices, handheld digital music players; Clear protective covers specially adapted for personal electronic devices, namely, mobile phones, portable musical devices, handheld digital music players; Head-clip cell phone holders; Leather protective covers specially adapted for personal electronic devices, namely, mobile phones, portable musical devices, handheld digital music players; Pouches made in whole or substantial part of leather, faux leather, plastic, vinyle [sic] specially adapted for personal electronic devices, namely, mobile phones, portable musical devices, handheld digital music players, excluding gaming apparatus; Protective covers and cases for cell phones, laptops and portable media players; Wireless headsets for smartphones,

Applicant's affirmative defense of laches is a complete defense to Opposer's dilution claim, and Opposer has not shown inevitable confusion to overcome laches as a defense to its likelihood of confusion claim.

With regard to Applicant's "Battery chargers; Battery chargers for mobile phones; Battery chargers for tablet computers; Cell phone battery chargers; Stands adapted for stereos and audio speakers; wireless speakers" Opposer has not shown likely confusion; however, Opposer has shown likely dilution by blurring as to those goods. In view thereof, Applicant's goods "Battery chargers; Battery chargers for mobile

40

phones; Battery chargers for tablet computers; Cell phone battery chargers; Stands adapted for stereos and audio speakers; wireless speakers" are deleted from the application, and the application, as so amended, will proceed for the remaining goods.

**Decision:** The opposition is sustained in part and dismissed in part.